for appellee.

## 47810. INSURANCE COMPANY OF NORTH AMERICA v. CITY OF DALTON et al.

CLARK, Judge. This is the second time this case comes before this court. The prior appeal is reported as *Berry v. Cordell,* 120 Ga. App. 844 (172 SE2d 848). A better understanding of this case can be obtained by quoting the facts as summarized in the previous opinion: "The Water, Light and Sinking Fund Commission is an agency of the City of Dalton which operates a natural gas, water, sewer and electric utility system. On the morning of December 7, 1967, signs of a leaking water pipe had been spotted in one of the streets. The city dispatched a crew of three men to investigate. This crew usually worked on water and sewer maintenance, though it had occasionally worked on gas lines. The city also called Berry Concrete Products Company to arrange for the services of a back-hoe and operator at the site. The city had often hired this Berry equipment in the past. The foreman of the crew instructed the back-hoe operator where to dig. There is evidence that on the way down to the water pipe, the back-hoe struck an exposed gas pipe. Within about an hour and a half, while the crew was still completing its work, there was an explosion in the house fronting on the repair site. The evidence tends to show that the occupants had noticed a strange smell that morning for the first time and had mentioned it to the crew outside. It also shows that the explosion occurred immediately after a person in the house lit a match. As a result of the explosion, a woman was killed and several others were severely burned."

Insurance Company of North America referred to herein as INA had issued a liability policy to the City of Dalton

which the parties apparently intended to cover only the gas operations because it described the insured's business as being "distribution and sale of natural gas." The exclusion stated the insurance was not to apply "(c) to injury arising out of the operation of the named insured as a water utility or as an electric utility." INA's appearance was for determination of the coverage under that policy.

The ruling of this court on the first appeal was that "INA will be obligated only if an act of negligence in the city's gas operations is found to contribute to the proximate cause of the injury." The case was remanded "in order that the trial court, if it sees fit, may make a finding of fact as to the specific act or acts of negligence which were the proximate cause of injury." After certiorari had been denied by our Supreme Court and the case returned to the trial court a two-day hearing was limited solely to INA and the City of Dalton with the court hearing evidence only "with respect to the negligence, if any, of the City of Dalton's gas utility division." (T. 18). The evidence transcript consists of 422 pages and a special exhibit file contains 42 photographs plus six survey and inspection reports, copy of a work order and a plat of the gas system.

Pursuant to Code Ann. § 81A-152 the trial judge was requested to make specific findings of fact and conclusions of law. This was admirably done by Judge Painter in a comprehensive judgment listing twelve specific findings of fact and seven conclusions of law with each of such legal conclusions stating the supporting citations of authorities. In the judgment holding coverage existed under the insurance policy for the City of Dalton the court stated seven specific "acts of negligence on the part of the City of Dalton in the operation of its gas distribution system [as having] contributed to the proximate cause of the explosion." (R. 172). This appeal by INA from the judgment

contends the ruling was erroneous "as there is no evidence of any negligence on the part of the City of Dalton operating as a gas utility which proximately caused or contributed to bring about the explosion in question." The enumeration of error attacks each of the seven particular acts of negligence. Although the consequence is a lengthy opinion, we regard it as necessary for this court to recognize the considerable effort which has been devoted to this case by counsel and by the trial judge by dealing with each of these seven specific acts which the trial court ruled to have met the directive of our previous decision for "a finding of fact as to the specific act or acts of negligence which were the proximate cause of injury." These are as follows: (1) In failing to cut the live gas off at the main and permitting it to be stored on the service line. (2) In failing to inform the property owner, Hayes, that live gas was in the service line. (3) In failing to extend the height of the riser after notice that the owner intended to cover it while filling in his yard. (4) In failing to mark or properly identify the covered service line and riser. (5) In failing to inspect the service line and riser in order to determine gas leakage. (6) In failing to inform Evans and Berry [crew foreman and back-hoe operator] of the location of the live gas service line. (7) In failing to establish and carry out a system of communications so as to inform the excavating personnel of the existence of service lines.

1. There are two general principles which guide our consideration here. They are: (a) "If there is any evidence to support the findings of the trial court, we must affirm. [Cit.] . . . On appeal the evidence is to be construed to uphold rather than to destroy the findings and judgment.[Cit.]" *Hamrick v. Seward,* 126 Ga. App. 5, 7 (189 SE2d 882). (b) "Natural gas is a dangerous agency. Its distribution is accompanied by many possible dangerous consequences, and it is therefore

well established that a higher degree of care and vigilance is required in dealing with such agency than is required in the ordinary affairs of everyday life. A degree of care commensurate to the danger involved is required of a distributor of natural gas to avoid injury and damage and, in case of failure to exercise such care, he is liable. [Cits.]" *Harvey v. Zell,* 87 Ga. App. 280, 285 (73 SE2d 605).

2. Was it negligence on the part of the city to store gas on the service line which ran from the main line into the homeowner's yard to the riser within 18 inches of the house? Was it negligence for the city thus to act without informing the homeowner that although he did not use gas, there was gas in the line running up to his house? The city's superintendent testified that it would be a better safety practice not to store gas in the unused service lines. In *Chisholm v. Atlanta Gas Light Co.,* 57 Ga. 29, 30, wherein the court said "that if the defendant had shut off the gas at the service-cock [at the curb] instead of at the meter-cock in the plaintiff's cellar . . . when it was notified that the plaintiff had no further use for its gas on his premises, the explosion would not have occurred . . . for the simple reason that there would not have been any of the defendant's gas on the plaintiff's premises to explode." In the instant case, similarly if gas had not been in stored unused service lines, but had also been shut off at the service cock, there would have been no explosion. The trior of fact found that the city had a duty to inform the homeowner, who did not use gas, that the service line that ran from the street to within 18 inches of his house contained gas. Since the gas was being stored for the city's convenience, this is a reasonable interpretation of its duty, particularly in view of the homeowner's action. The homeowner had no reason to suppose that the line contained gas, but when he covered up the riser he notified the office manager of the gas, water

and sewer departments and requested that the riser be lengthened so that it would be visible. The office manager who would know that such lines contained gas refused to lengthen the riser, despite the fact the crew checked for risers as a means of determining the existence of gas lines before excavating, and despite the superintendent's testimony that covered risers on used and unused service lines were one of the problems that meter readers checked for. "The fact that the heater had functioned properly from the time of conversion by the city . . . would not relieve the defendant as a matter of law from the alleged duties to install a safety shut-off or warn against the danger of not having one installed for the reason that the purpose of the shut-off is to stop the escape of gas." *City of Albany v. Burt,* 88 Ga. App. 144, 160 (76 SE2d 413). There as here it is for the trior of fact to determine whether the city was negligent in its duties. "The defendants have the duty of ordinary care. It is a jury question as to whether or not the duty of exercising such care entailed the degree of caution shown by the allegations of the petition or whether greater caution was indicated. Negligence, whose negligence and what negligence, are questions for determination by a jury." *City of Griffin v. McKneely,* 101 Ga. App. 811, 818 (115 SE2d 463). Sections 1 and 2 of the enumeration are therefore without merit.

3. Concerning sections of the enumeration numbered 3, 4 and 5 we are faced with the question, did the city exercise such care, skill and diligence as is proportionate to the delicacy, difficulty and nature of this particular business, namely the gas system? See *Liberty Homes v. Stratton,* 90 Ga. App. 675, 679 (83 SE2d 818).

Questioning of the city's superintendent elicited that while there had been a contract in 1966 or '67 with an outside specialist to inspect the main gas lines in the

street, this contract did not include service lines leading from the street to individual meters or risers (in cases where gas was not utilized by the home owner). There was no formal inspection of the service lines. It was the duty of the meter readers to check service lines, whether in use or not, since both contained gas, and "the meter reader's responsibility is to notice anything that might be of an unusual nature, a cut-in pulled off of a house, whether there is an electric cut-in or a water meter that is leaking or a gas riser pipe that was covered up, that would be an unusual circumstance and it should be reported by the meter reader." (T. 61). The meter readers would know whether or not there was a line leading into a piece of property, because they would be furnished with that information.

In the instant case the property owner testified he had notified the office manager for the Water, Light and Sinking Fund Commission at the time he covered the riser and requested the riser be lengthened so that it would be above ground. This request was denied. The crew testified they had checked to see if a riser was there before excavating.

In addition the commission had purchased equipment for detection of gas leakage. The superintendent testified an inspection could have been made of that service line if he had felt the need and that from his examination "if there was a leak there, as I think there was, and if we had placed the probe in the vicinity of it and checked it we would have found a leak . . ." (T. 79). There was also testimony that a leak sleeve or clamp (which prevents leakage from an existing break in the pipe) had been placed on the riser prior to the incident and that there was no knowledge of its existence and no inspection of its condition had ever been made.

There is conflict in the evidence concerning the existence

of a prior break and leak in the gas line. The judge, sitting as jury and acting as fact-finder, evidently accepted the city's superintendent's testimony. This witness was qualified as an expert and testified as follows: "I am of the opinion that there was a break in the pipe prior to the day of the explosion and I am of the opinion that that was probably broken by filling in dirt around it and I am of the further opinion that the break was increased the day of the explosion. Q. Now, upon what do you base your opinion that it had been there for some time prior to the explosion? A. Well, the first thing that I noticed, and was the primary reason for having it dug up the day of the explosion, was that there was a fairly large dry area [12-18 inches] in around the elbow at a time when the ground was wet everywhere else. It had been raining at that time and made it a lot easier to notice, to see this sort of thing, and I also—I also saw the area around the pipe, it appeared to me to have had an older break." (T. 41, 42). "[B]ut if you examine the pipe itself I think it is apparent that there are differences in the color that indicates some change in the pipe probably due to a break earlier." (T. 44). When queried as to the cause of the dry spot, the witness testified, "I think there had been a gas leak because natural gas is dry and this is what you find when you find a leak. Now, we don't have a lot of leaks but we do have leaks occasionally and all gas systems do and every time you dig one up you find a dry spot." (T. 45).

As to the length of time the leak had been in existence, "No, I can't assign a time except to say that it had been for a number of days . . . but it is the sort of thing that, in my opinion, don't happen overnight." (T. 45). The witness further testified that the dry spot could not have been caused by a gas leak over the period of 12 hours. "I am of the opinion that it had been there for several weeks or maybe months." (T. 46). He also

testified the spot was hardened and required a shovel and a pick to break it up.

Although defendant's expert witness testified that in his opinion there had not been a prior break, there are certain rules applicable to expert witnesses which bind us here. "Where a trial judge hears a case without the intervention of a jury, the credibility of the witnesses is for his determination. [Cits.]" *Simmons v. State,* 111 Ga. App. 553 (1) (142 SE2d 308). In accord, *Mustang Transportation v. W. W. Lowe & Sons,* 123 Ga. App. 350 (3) (181 SE2d 85).

"The credibility of a witness is a matter exclusively for a fact-finding body when the facts testified to by him are not inherently at variance with the common knowledge and experience of mankind; and a reviewing court with power to determine questions of law only can not interfere with the findings crediting a witness, no matter how many witnesses may have testified to the contrary or how many circumstances may have been adduced to disprove the testimony of the single witness. Code § 38-1805; [Cits.]" *Hayslip v. Liberty Mutual Ins. Co.,* 72 Ga. App. 509 (34 SE2d 319). "The opinions of experts on any question of science, skill, trade or like questions are admissible, and the weight and credit to be given such testimony is for the jury [judge sub judice]. See Code § 38-1710. [Cit.]" *Central Truckaway System v. Harrigan,* 79 Ga. App. 117 (5) (53 SE2d 186).

The testimony makes clear the service lines were not regularly inspected although they contained gas and gas is inherently dangerous. Certainly, the existence of an unchecked leak sleeve, the fact that the riser was not apparent above ground which led the crew to conclude that there were no gas lines in the vicinity, made this service line particularly dangerous. In addition the testimony of the prior existence of the break and gas leakage supports the trial judge's

findings of 3, 4 and 5. Therefore, these sections of the enumeration are without merit.

4. Was the city negligent in failing to establish a uniform system of communication whereby it would be mandatory for anyone excavating within the city limits to be informed as to the existence and location of underground lines, particularly gas? According to the testimony there was no uniform system of communications. No permits or paperwork were required before either the water or sewer division made an excavation. The city had essentially one department containing the three divisions of water, sewer and gas. The assistant superintendent was in charge of distributing the work for all three divisions. The crews worked interchangeably on any of the three divisions, depending on their assignments. The assistant superintendent had maps showing gas lines, and as the work was assigned by him, he had the responsibility to see that the crews knew what underground lines were in their working area. However, from the testimony it appeared that the assistant superintendent did not always assign the work. In the event the crew foreman saw a problem, he had the power to fix it and afterwards report to the assistant superintendent. Although this power was intended to be limited to an emergency, testimony elicited that over a period of time the emergency status had not been rigidly adhered to so that the practice was for the repairs to be made when apparent and then reported when it was more convenient. Consequently, repairs were made before the assistant superintendent knew of any excavation and he, knowing this, did not require that he be contacted as to the whereabouts of underground lines before any excavating.

Since the crew also worked on gas lines, it had knowledge of most of the lines. The crew on preparing to excavate looked for a riser checking for any indication of gas

lines. Obviously, this was a customary and accepted means of determining the existence of underground lines.

The insurance company's expert witness testified he recommended as a matter of course that it was a safer operating practice for the operator of a gas utility to adopt and enforce a policy which will not allow entry into the city streets under which there are public utilities without first obtaining information from the gas department as to the location of gas or gas service lines or gas mains. In fact Code Ann. Ch. § 92A-13 adopted in 1969 which was after this explosion now requires that such action be taken. The trior of fact could find that in practice the city had not implemented effectively a method which would accomplish the safety directives' purposes. The city had been notified of these safety measures. "[W]e do not consider any conduct as shown by the evidence in this case to be such as to demand a holding, as a matter of law, that the violation of the city ordinance is not a factor in the proximate cause of the explosion, either alone or in combination with other factors. The purpose of the ordinance as a safety measure to prevent just what did happen in the present case is so obviously relevant to the consideration of proximate cause that it requires no further discussion." *Atlanta Gas Light Co. v. Slaton,* 117 Ga. App. 317, 322 (160 SE2d 414). Although there was no ordinance sub judice, a safety recommendation by the insurance company which was ineffectively implemented is just as relevant to the consideration of proximate cause in this case.

"Where the evidence is conflicting, the questions of negligence, contributory negligence, and proximate cause are for the jury [judge sub judice]." *Bell v. Lewis,* 74 Ga. App. 26 (2) (38 SE2d 686). In accord *Harvey v. Zell,* 87 Ga. App. 280, supra, p. 284, and cits. "[W]here

the trial judge, sitting as the trior of the facts, hears the evidence, his findings based upon conflicting evidence is analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support it. [Cit.]" *West v. West,* 228 Ga. 397 (1) (185 SE2d 763).

5. "It is a well-settled principle of law that where two concurrent causes operate directly in bring[ing] about an injury, there can be a recovery against one or both of the responsible parties. The mere fact that the injury would not have been sustained had only one of the acts of negligence occurred will not of itself operate to define and limit the other act as constituting the proximate cause, for if both acts of negligence contributed directly and concurrently in bringing about the injury, they together will constitute the proximate cause." *Atlantic C. L. R. Co. v. Ouzts,* 82 Ga. App. 36 (1) (60 SE2d 770). "An act wanting in ordinary care that actively aided in producing the injury as a direct and existing cause is a proximate cause thereof. [Cit.] 'The juridical or proximate cause of an injury is not necessarily the sole cause.' [Cit.]" *Southern R. Co. v. Lunsford,* 57 Ga. App. 53, 61 (194 SE 602).

" 'The conduct of a defendant cannot be declared to be negligence, as a matter of law, unless it has been so declared by a lawmaking body, and, in the absence of such a declaration the jury [judge sub judice] is the arbiter of the question of whether a defendant's conduct on a given occasion is negligent, and, if so, whether such negligence is the degree of negligence required for a recovery by a plaintiff.' [Cit.]" *Hollimon v. Wall,* 127 Ga. App. 122 (192 SE2d 411). See *Austin v. Smith,* 96 Ga. App. 659, 663 (101 SE2d 169).

6. Here the judge acting as fact-finder found the seven specific acts of negligence by the city's gas division to have been contributors to the proximate cause. Under the any evidence rule and the authorities herein stated

we affirm the judgment declaring the insurer is required to defend and cover the tort cases under its policy as the exclusion of water and electric utility operations was not applicable.

*Judgment affirmed. Hall, P. J., and Evans, J., concur.*

SUBMITTED JANUARY 8, 1973 — DECIDED APRIL 2, 1973 — REHEARING DENIED APRIL 24, 1973 — ■

*Milligan, Hooper & Harris, Fred M. Milligan,* for appellant.

*McCamy, Minor, Phillips & Tuggle, Carlton McCamy, Pittman, Kinney, Kemp, Pickell & Avrett, L. Hugh Kemp,* for appellees.